# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 8351 | **DATE** | 9/26/2001 |
| **CASE TITLE** | Allen McKechnie vs. St. Paul Fire and Marine | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated above, the motion for summary judgment is granted and judgment is entered in favor of the defendant.

(13-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | | |
| ✓ | Docketing to mail notices. | SEP 26 2001 date docketed | |
| ✓ | Mail AO 450 form. | | 34 |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| TP | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

SEP 2 6 2001

Document Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLEN McKECHNIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 98 C 8351 |
| v. | ) | |
| | ) | |
| ST. PAUL FIRE AND MARINE | ) | Judge John A. Nordberg |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Allen McKechnie alleges that his employer discriminated against him because of his physical disability. His employer has moved for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

We begin with a basic outline of the facts. In 1987, plaintiff began working as a special claims investigator for St. Paul Fire and Marine Insurance Company ("St. Paul"), which is a corporation headquarted in Minnesota. Plaintiff worked out of St. Paul's Chicago Service Center, and investigated claims for fraud.[1] After working a number of years in this position, plaintiff informed his employer in October of 1996 that he was suffering from a condition known

---

[1] In a typical investigation, a special claims investigator would visit the accident site, interview witnesses, make telephone inquiries, and later prepare a written report detailing his conclusions.

as peripheral neuropathy, which is a deterioration of the peripheral nerves that causes fatigue and pain in the extremities.

As discussed in greater detail below, this communication triggered within the company a collaborative effort to develop a plan of accommodation. After taking some time to study the company's proposed accommodations, plaintiff indicated that they were adequate and was thus able to perform in his job throughout 1997. In February of 1998, plaintiff was told during his annual performance review that his work was deficient and that he must work under a temporary performance improvement plan. The plan required that plaintiff not work from his home at any time during the traditional 8 to 5 business hours. That same day, after talking with his doctor, plaintiff concluded that he could not meet this new work rule due to his disability. Plaintiff never returned to work and subsequently applied for and received long-term disability benefits.

We will now summarize the facts in greater detail.[2] As in many employment disputes, there are two competing theories to explain what happened, one pointing to discrimination and one pointing to the employee's poor job performance. St. Paul focuses on plaintiff's job performance. It cites to performance problems documented in plaintiff's semi-annual performance reviews beginning as early as 1992 – a number of years before plaintiff's condition became known. It believes that these performance deficiencies were significant and related to two different aspects of his job: (i) the lack of detail in his written investigation reports and (ii) his lack of "field work," *i.e.*, the amount of time he actually spent conducting on-site investigations.

---

[2]The factual record is lengthy. Plaintiff's statement of additional material facts covers 291 paragraphs.

Plaintiff greatly disputes both the seriousness of these criticisms and the reason for them. He says that they were simply constructive criticisms that were not serious nor job-threatening and that they related primarily to the quality of his written reports and not to his lack of field work. He points out that the same performance reviews relied on by the defendant also contain many positive statements about his work. Plaintiff does admit that he had a weakness in the area of "file review" but asserts that this was not an important aspect of the job. As plaintiff explains, he had a propensity to take on too many files and to do whatever was asked by his claim adjuster "clients" and thus placed overall results and claim adjuster satisfaction higher on his priority list.[3] He says that he was told to write "thicker reports" and to put in more "fluff" and that his failings related to these "procedural" requirements of the job.

Rather than poor job performance, plaintiff believes that disability discrimination was the real explanation for the events that unfolded in this case. His claim focuses primarily on one person in the company – Tom Owens. In 1995, Owens became plaintiff's immediate supervisor, a position for which plaintiff had also applied.[4]

Before turning to the key events of this lawsuit that took place in late 1996 and thereafter, we will first briefly describe an earlier skirmish between Owens and plaintiff, one which plaintiff

---

[3]At St. Paul, special claims investigators received investigation referrals from the claims adjusters working in the Chicago office and therefore were told to treat those claims adjusters as if they were clients.

[4]St. Paul suggests that competition for the same job may have been the source of the apparent friction between plaintiff and Owens. In his deposition, when asked whether Owens was more qualified than he was for the job, plaintiff said that he Owens was a "babe in the woods" and "knew nothing" about being an insurance fraud manager but that he did know "home office politics probably better than anyone."

claims foreshadowed the later events in his complaint.[5]  Plaintiff alleges that he began to have

trouble typing due to loss of feeling in three fingers and asked Owens if he could get a voice-

activated typing software program called Dragon Dictate.  After looking into the issue, Owens

allegedly told plaintiff that the program was not worth the cost.  Plaintiff then contacted Lemont

Moore, the human resources manager in the Chicago office, about the possibility of getting the

program.  Soon afterwards, plaintiff received an irate phone call from Owens telling him to

purchase the program and "stop causing trouble."  Moore then called plaintiff to his office and

allegedly suggested that plaintiff go on disability because Owens "was going to get rid of him

one way or the other because [Owens] wanted no cripples around."  Plaintiff did eventually get

the software program, but he complains that it took more than a year to get it due to Owens' foot-

dragging.

Plaintiff was formally diagnosed with peripheral neuropathy in late 1995.  In October of

1996, he informed Owens about his condition and requested accommodation.  During this same

time period plaintiff also sent a letter describing his condition to some unnamed individual

higher up in the company.  Shortly thereafter, plaintiff received a call from Owens who chewed

plaintiff out for going over his head.  Owens said he had been working on the request and "how

dare [plaintiff] try to get him in trouble and cost him his job."  Owens further stated:  "Who do

you think you are, you are no special case, you should just follow the chain of command."

Owens eventually informed his supervisor and the human resources department about

_____

[5]This incident was not included in plaintiff's EEOC charge.  Moreover, there are potential
evidentiary problems related to these allegations as well as some uncertainty as to the exact dates
involved.  However, we include this incident in an effort to give plaintiff a full opportunity to tell
his side of the story, consistent with the fact that we are considering a motion for summary
judgment brought by the defendant.

plaintiff's request for accommodation. On November 4, 1996, the company responded by hiring an outside consultant (Sandra Heinrich) to help develop a plan of accommodation for plaintiff. Heinrich owned a firm providing case management services for employees returning to work with injuries or disabilities.

Over the next several months, Heinrich coordinated a joint effort among a number of individuals to come up with a suitable plan of accommodation to allow plaintiff to continue working despite his peripheral neuropathy. In the initial phase of her work, Heinrich gathered information. She spoke to plaintiff and Owens several times to learn more about plaintiff's condition and job responsibilities. Both men raised the issue of whether plaintiff would be able to climb ladders when he visited accident sites. In addition, Owens indicated that plaintiff needed to be at the office between four and five days a month to review files with claims adjusters. Owens explained that the company required special claims investigators to maintain a "presence" in the Chicago office. Plaintiff told Heinrich that his commute to work left him feeling fatigued, that he believed that reviewing files at home would allow him to be more productive because he could take rest periods during the day, and that he would be willing to work on weekends and off hours to complete his duties.

Heinrich also asked plaintiff's doctor (Mark Bernhard) to describe plaintiff's work restrictions. On December 3, 1996, Dr. Bernhard provided a letter that formed the framework for subsequent discussions. Dr. Bernhard stated that plaintiff's condition "affect[ed] the sensory nerves in his legs so that he cannot tell where his feet are at times," which in turn made it "especially difficult" for plaintiff to "climb ladders, or stand or walk for long periods of time." He also noted that plaintiff had "a general sense of fatigue." Dr. Bernhard recommended that

-5-

plaintiff be permitted to "pace himself and take a rest period." Due to plaintiff's need for "frequent rest periods," he would not be able to work a "typical 8-hour day" and would require 12 hours to peform 8 hours worth of work. Dr. Bernhard also suggested that plaintiff be permitted to work at home, if possible, because plaintiff found such an arrangement to be more productive.

On December 9, 1996, Heinrich met with Owens, Lynn Zonakis (a disability case manager with St. Paul), and Peggy Gunderson ( a senior employee relations specialist) to discuss possible accommodation measures. Heinrich summarized the information she had obtained and made some suggestions. After some discussion, they agreed that Owens would put together an email to be sent to plaintiff summarizing the accommodations the company was willing to provide.

On December 16, 1996, Owens emailed plaintiff with the company's proposal. The proposal tracks the concerns raised in Dr. Bernhard's letter. Because this email is important and also provides a good summary of the particular accommodations at issue, we will quote it in its entirety despite its length:

> Last October you approached me with concerns about your ability to perform your job and asked if we could find ways to accommodate you in your job. In response to your request, we assigned an outside rehabilitation consultant to work with you and assist us in identifying reasonable accommodations for your job.
>
> After a careful analysis of your physician's recommendations, we have identified a number of accommodations we can make [] to allow you to overcome your major limitation – fatigue. These will allow you to continue to perform the major functions of your job. Below I summarize your physician's recommendations and list ways in which we are prepared to accommodate.
>
> As you know, your physician called Ms. Heinrich (the consultant we hired) on December 10, 1996, in response to your request for your doctor to further

-6-

elaborate on his recommendations. At that time Ms. Heinrich reviewed our sugested accommodations with him. Your doctor concurs that they are appropriate and will allow you to perform your major job functions.

Your doctor wrote indicating some things that bother you. He talks about climbing ladders, standing or walking for long periods of time. You can plan your workday so that you do not have to do these for long periods of time. There are almost always chairs to sit in where ever you may be. You also have the option of sitting in your car should the standing period be too long.

Your doctor explains you need rest periods, that it may take you 12 hours to do 8 hours of work. We can accommodate this as well. We are working with our space planning staff to obtain a supervisor's size cubicle for you and placing either a cot or a reclining chair in it for you. This will allow you to lie down and rest for whatever time you need. If you need 2 hours of rest you may work from 8:00 AM to noon, take lunch, and rest from 1:00 to 3:00. You can then finish your workday from 3:00 to 6:45 then go home.

We can accommodate you when you are working "on the road" as well. If you are near the downtown area you can stop at the office in midday and rest. If you are not, then you may use the back seat of your car.

The parking problem was mentioned. Lamonte Moore explained to me there are handicapped parking spaces within 1 block of the office (I think across the street). I encourage you to use them. Of course, when you are traveling on business we will pay the parking. If it is part of your commute we will not pay the parking.

We are working with Chuck Goetz regarding the evacuation plan for you should there be a disaster at the office.

We are aware that rush hour in Chicago can make for a long ride. There are several options available. Many people choose to drive to work early. Others come in late and work late. Many ride the train. You may choose any of these options. Of course, if you are traveling on business we will pay the train fare. If it is part of your commute, then we will not.

Your doctor did not mention at all your ability to drive. I know that in the past your wife has driven you to business appointments. This practice must stop. You can drive yourself and I expect you to drive yourself.

With regard to your request that you become a virtual employee and work out of your home, I can not and will not approve such a change. It does not fit our business strategy. It is essential that our special claim investigators be a part of

the local claim office and network with those claim professionals. Since you are fully capable of working in the office setting, as your doctor agreed to, there is no need or reason for us to consider this change.

I need your advice regarding your preference for a cot or a reclining chair. Please let me know by December 23, 1996, (either by telephone, voicemail or email) which you would prefer.

If you have an[y] questions or comments, or need to discuss these, please feel free to call.

(12/16/96 Email from Owens to McKechnie).

Initially plaintiff appeared hesitant about agreeing to the proposal. He called Heinrich and told her that Dr. Bernhard would be sending a second letter, which would supposedly provide a better description of his medical problems. Plaintiff also sent an email to Owens asking for more time to study the proposal.

Despite this apparent hesitation, on January 7, 1997, plaintiff sent an email to Owens indicating that he would accept the proposed accommodations. The email stated (in its entirety) as follows:

I will attempt to respond to this starting at the end and working my way to the beginning. Allow me to thank you for allowing me extra time to properly consider my response. First, I was not requesting to become a virtual office situation, that was my doctor's suggestion in the letter he prepared. I do understand and support your direction with the investigation operation. Second, regarding parking, the point is moot, I will be using the public transportation, since I am relinquishing the company car. I am fully aware that the cost of the commute is not open for compensation. Third, regarding resting in the car, this is not a safe practice due to Carbon Monoxide potential exposure, I will not be choosing that alternative. Regarding the rest of the suggestions regarding pacing myself, I concur and will govern myself accordingly. I have purchased a vehicle which is easier for me to drive and to extend my time on the road. Regarding rest periods I am hoping that I can develop and use alternative methods of pain control which will permit me to lessen my [prescription] use of drugs. In doing so I sincerely hope that my work will improve and become more satisfactory to you. Regarding a choice of a cot or reclining chair, I must choose the chair, there are

numerous reasons behind this all of which make better business sense. If there is any thing in what I have written that is unclear, sounds wrong, needs explanation or has caused any offence please contact me as soon as convenient so that the misunderstanding can be corrected fore any damage occurred.

(1/7/97 Email from McKechnie to Owens).

Plaintiff raised no further concerns at this time, nor did he indicate that he could not perform his job with the accommodations being offered. Dr. Bernhard, who also received a copy of the Owens' proposal, also never voiced any concern about the adequacy of these same accommodations.[6]

Owens worked with a space planner to find space in the office for plaintiff's recliner but claims that there was no individual office or supervisor's cubicle available. Therefore, Owens arranged for the recliner to be placed in a cubicle with supervisory height walls located immediately next to plaintiff's cubicle. Plaintiff disputes the assertion that there was no space available for a supervisory cubicle and says there was vacant space on other floors. The recliner that was promised in the Owens' email was not provided until October 1997.

The first half of plaintiff's case concerns the adequacy of these accommodations and whether they were reasonable under the ADA. The second half of plaintiff's case centers on what plaintiff believes was a campaign by Owens to retaliate against him because he had been able to receive accommodations.

Plaintiff alleges that this effort began soon after he made the request for accommodation.

---

[6]One important issue that was not resolved at this time was how much time plaintiff could work at home. It was clear that the company had rejected the concept of plaintiff working full-time at home out of a "virtual office" and that plaintiff was required to spend some amount of time in the Chicago office. At the same time, St. Paul did not indicate at this time that plaintiff could not do any work out of his home.

On December 5, 1996, Owens called Peggy Gunderson to discuss plaintiff's annual performance review which he was preparing at that time. Owens told Gunderson, among other things, that he felt that plaintiff had "mastered manipulating the sytem." On December 16, 1996, Owens again called Gunderson and indicated that he had "miscalculated some scores" on plaintiff's performance rating and that he was using some discretionary "assessment points" to lower plaintiff's performance rating from "exceeds position objective" to "meets position objective."

In February of 1997, Owens was promoted to another position, and David McCook took over as plaintiff's immediate supervisor. However, Owens talked to McCook about plaintiff's disability and accommodations and continued to keep in contact with McCook regarding plaintiff's situation. During 1997, plaintiff received further negative comments about his job performance.

We now turn to the critical meeting that took place on the morning of February 12, 1998 when plaintiff was given his 1997 performance rating and was told that he must work under the performance improvement plan. The performance rating was conducted using the same format as before with numerical ratings given in a number of categories. Just as Owens had done a year earlier, McCook subtracted discretionary assessment points from the numerical total, dropping plaintiff's overall score from "meets position objectives" down to "meets minimal position objectives." Plaintiff claims that he specifically asked McCook why he deducted 150 assessment points and was told that it was because of the "problems you were having with Tom Owens." Also, plaintiff claims that he asked McCook about an error that Owens made in one of plaintiff's

file scores and McCook allegedly responded: "You know what happened the last time you proved Tom was wrong, he retaliated. It's not worth it."[7]

In the meeting, plaintiff was given a 5-page memorandum entitled "Formal Performance Improvement Plan." This performance improvement plan ("PIP") proposed a course of action designed to bring plaintiff's performance up to acceptable levels. Relevant to this lawsuit, the key requirement was the following:

> You must immediately begin operating from the St. Paul's downtown Chicago office location as your primary work station. Between the hours of 8:00 A.M. and 5:00 P.M. on weekdays except when the office is closed for a holiday or you are officially excused from duty (vacation, floating holiday, essential day off) you will never be at your residence. You will be located in one of four places . . . traveling between home and the Chicago office, at the Chicago office, traveling on business, or conducting an investigation at a particular location.

The PIP concluded by stating that plaintiff could be fired if there was not immediate and sustained improvement in his work performance and that the company would review his status in late March or early April. During the meeting, plaintiff asked McCook what he should do if he started his day at 4 a.m. traveling to an investigation site, thus making his work day end earlier than 5 p.m. McCook allegedly responded that plaintiff should "go sit in a restaurant" and that if he was ever at home before 5 p.m. he was fired.

Plaintiff states that he immediately realized from this meeting – based on both the harshness of the 8-to-5 rule and on the direct comments by McCook -- that Owens and McCook were trying to retaliate against him and that he had no other alternative but to apply for disability

---

[7]In his affidavit filed after his deposition, plaintiff also alleged that, at some point after this meeting, McCook told plaintiff that "a crippled guy would never fit in to the investigation department" and that, although a handicapped individual "does great in accounting," he would not "fit into our department . . . and I don't think you will either."

benefits. He says that his sense of futility was heightened by the fact that McCook told him in the meeting that the PIP was put together "by everybody." That same afternoon, plaintiff went to see his doctor and told him that he did not want to go on disability leave but did not think he could work under the new rule because of his disability. After reviewing the new rule set forth in the PIP, Dr. Bernhard agreed with plaintiff's assessment. Accordingly, plaintiff never returned to work.

Although plaintiff says that he knew immediately after the February 12th meeting that he was being discriminated against, he never informed anyone else at the company about this fact. Later in the morning, shortly after his meeting with Owens, plaintiff sent an email to Paul Olson, which stated: "I am in the office this morning for a meeting with Dave. I am going home sick this afternoon, not Dave's fault!" Over the next two weeks, plaintiff remained out of work and sent periodic emails to Paul Olson in which he stated that he was not able to work due to various problems with his medication.

## DISCUSSION

Plaintiff brings a claim under the Americans with Disabilities Act. As noted above, his claims covers two parts. The first part concerns the accommodations provided 1997; the second concerns the February 12, 1998 meeting. Before addressing these questions, we briefly touch on two threshold points. First, the defendant has raised no argument challenging the fact that plaintiff's disability (peripheral neuropathy) constitutes a "disability" under the ADA. Second, the defendant does argue that the plaintiff could not perform the essential functions of his job due

to his disability.[8] As we understand it, this argument is different from the disputed issue of whether plaintiff was adequately performing his job with regard to his weakness in file review and other matters – a question which both sides seem to agree had nothing to do with his disability.

In the present argument, defendant appears to be arguing that plaintiff could not (even with accommodations) meet the physical requirements of the job as a result of his disability. St. Paul states, for example, that the investigation sites were often located in potentially hazardous places, such as fire-damaged buildings and high places, and that the job sometimes required heavy lifting. Although St. Paul mentions these facts, it fails to fully develop the argument and specifically fails to show that these abilities were essential to the job. Moreover, there is nothing in the record to suggest that the company had indicated any concern about plaintiff's inability to climb ladders or lift heavy objects. For these reasons, we find that plaintiff survives summary judgement on this issue.

## I.     The 1997 Accommodations.

We now consider the first part of plaintiff's claim, which focuses on the initial accommodations given to plaintiff in early 1997. In this part of his claim, plaintiff admits that the company generally engaged in a good faith effort to accommodate his disability but argues that the company's efforts fell short in six specific areas. Plaintiff is thus arguing that the

---

[8]As a prerequisite to bringing an ADA claim, an individual must demonstrate that he is a "qualified individual with a disability." A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

company failed to live up to its duty of accommodation under the ADA.[9]

Stated in basic terms, the duty of accommodation under the ADA requires that an employer do what is necessary to enable the disabled worker to work in "reasonable comfort." *See Vande Zande v. State of Wisc. Dept. of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). In order to comply with this duty, the employer must be aware that the employee needs accommodation in the first place. Hence, the employee has an affirmative obligation to inform his employer that he needs accommodation. *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1134-35 (7th Cir. 1996). After the employee comes forward with a request, both sides then have a duty to work together to find a solution. The regulations to the ADA state that both sides should work together in an "informal, interactive process" to find a solution. *Id.* at 1134. The solution need not be a "a perfect cure for the problem." *Stewart v. County of Brown*, 86 F.3d 107, 112 (7th Cir. 1996). Nor is the employer required to provide the particular accommodations requested by the employee. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000).

After carefully reviewing the entire record and construing all reasonable inferences and facts in plaintiff's favor, we conclude that no reasonable jury would find that St. Paul failed to provide reasonable accommodations to plaintiff in 1997. Before specifically addressing the six specific complaints made by plaintiff, it is important to put them in the larger context of the overall effort made by the company.

One factor to consider when analyzing whether an employer complied with its duty to

---

[9]*See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) ("Once a plaintiff has established that she is a qualified individual with a disability, she may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate.").

provide reasonable accommodation under the ADA is whether the employer took the employee's request seriously and attempted to work toward a solution in a good faith interactive process. In this case, all the undisputed evidence says that St. Paul did so. In fact, plaintiff seems to concede this point as he repeatedly states in his brief that St. Paul did engage in an interactive process with him.

To summarize the undisputed facts, after learning of plaintiff's request for accommodation, the company hired an outside consultant who specialized in handling such matters. This consultant (Heinrich) led a collaborative two-month long process to find a solution. There is no evidence in the record to suggest that Heinrich was biased or insincere or that she was hampered in her effort to find a solution. She consulted numerous times with all of the key individuals. In particular, she sought input from both plaintiff and his doctor and used a letter from plaintiff's doctor as the framework to develop the proposed accommodations. In addition, various individuals in the company were involved in the process. The process led to a proposed plan of accommodation set forth in the December 16th email.

In his January 7th email, plaintiff accepted these proposed accommodations. Other than his assertion that he did not want to rest in his car due to a concern about carbon monoxide, plaintiff raised no concern about the adequacy of the accommodations. Likewise, plaintiff's doctor also did not voice any objections to the proposal. The available evidence thus suggests that the process worked just the way the regulations envisioned – an interactive process with multiple participants working toward a solution that all sides were able to agree on. *See, e.g.,* *Beck*, 75 F.3d at 1136 ("there is nothing in the record from which we can discern any attempt by the [employer] to sweep the problem under the rug.").

Although plaintiff admits that he did accept the proposals that were offered, he now claims that he only did so because Owens had warned him that he would not get anything more and that he should not create any further problems. Plaintiff thus claims that he had no other option but to simply accept the proposed accommodations in silence even though he believed at the time that they were not fully adequate. Plaintiff's decision to remain silent is similar to his later decision to quit work without complaining to anyone that he was being treated unfairly, which is discussed in Part II below. In both cases, plaintiff claims that it was futile to register any protest.

Although there may be factual scenarios in which an employee would be justified in concluding that it was futile to complain, this case is not one of them. Because this case is before us on a motion for summary judgment, we will accept plaintiff's version of the disputed facts, which includes his primary assertion that Tom Owens was trying initially to sabotage plaintiff's effort to get accommodations in 1997 and that he (along with McCook) later sought to retaliate against plaintiff. Even if this central allegation is true, we do not believe that plaintiff was justified in remaining silent on either occasion.

This conclusion arises out of the basic duty, imposed upon both plaintiff and his employer, to participate actively in the interactive process. *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer.") As the Seventh Circuit said in *Beck*, "neither party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability." 75 F.3d at 1135. In cases where there is a breakdown in the interactive process, "courts should look for signs of

-16-

failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary." *Id.* In particular, "[a] party that fails to communicate, by way of initiation or response, may [] be acting in bad faith." *Id.*

With regard to plaintiff's decision to remain silent in January 1997, plaintiff was well aware that St. Paul was making a sincere effort to accommodate his disability. He also knew that this effort involved other people in the company than just Owens. For example, Peggy Gunderson in the human resources department participated in the process. Lynn Zonakis was also involved. There is no suggestion anywhere in the record that any of these individuals or anyone else in the company (aside from Owens and McCook) were acting based on any improper discriminatory motive or had any goal other than finding a reasonable solution to the problem. In addition, it seems clear that Owens was not the final decision-maker and had to respond to the concerns of these other individuals.[10] In fact, plaintiff's theory of the case rests on the central premise that Owens was retaliating against plaintiff because he was mad that plaintiff had been able to "go over his head" and get the company to respond to his concerns.

On December 16, 1996, plaintiff was given a specific proposal and was asked to respond. He had the perfect opportunity to speak up. He took extra time to study the proposal, talked further with Heinrich and his doctor, and even had his doctor re-write the original letter in order to provide a better description of his disability. After taking all these steps, he affirmatively indicated that the accommodations were adequate. As plaintiff explains in his response brief, although he did not think that the accommodations offered were "fully appropriate," he

---

[10] For example, in December of 1996, Owens sought input from Gunderson on how he should handle certain aspects of plaintiff's performance evaluation.

nonetheless "accepted them with a good faith and heartfelt desire to keep his job and not create consternation." Rather than being a forced move, as plaintiff suggests, we think that this was simply a voluntary decision plaintiff chose to make.

On at least two prior occasions, plaintiff demonstrated that he was fully capable of raising complaints about his work situation when he felt the need to do so. The first instance involved the effort to get the voice recognition software and the second concerned the initial request for accommodation in October of 1996. In both instances, plaintiff claims that Owens was attempting to thwart him. Yet, in both instances, plaintiff contacted others in the company and was able to get a response despite Owens' alleged obstruction. Based on these two instances, there is every indication that the company would have responded to plaintiff's concerns in January 1997 if he had raised them. The critical point is that, due to plaintiff's decision to remain silent, we cannot know how the company would have responded because plaintiff never gave the company a chance to act.

Placed in this larger context, we find that plaintiff's six specific complaints fail to rise to the level of an ADA violation. First, plaintiff claims that the company agreed that he only needed to come to the Chicago office from 10:00 a.m. until 2:00 p.m. two days per week. This purported agreement, however, was not included in the December 16th email proposal. Therefore, plaintiff should have raised this point in his January 7th email when he accepted the proposed accommodations. He failed to do so and therefore cannot pursue this complaint now. Second, in a similar vein, plaintiff says that the company should have paid for his handicapped parking space closer to the Chicago office. Although plaintiff complains about this issue now, when the issue was raised at the time, plaintiff affirmatively stated that it was moot. *See* 1/7/97

Email ("regarding parking, the point is moot, I will be using the public transportation, since I am relinquishing the company car.").[11]

Third, plaintiff complains that the proposed accommodation of resting in the back seat of his car was unworkable because of the hazards of carbon monoxide and criminals and because it was illegal. Although plaintiff did raise some of these concerns in his January 7th email, plaintiff has not shown that his overall accommodations were rendered inadequate as a result. Plaintiff was told that he could go to a restaurant or other public place to rest. He also could arrange his schedule to accommodate the need to rest. Therefore, even assuming this aspect of the proposed accommodation was "unworkable" as plaintiff claims, it does not constitute an ADA violation.

Fourth, plaintiff complains strongly about the fact that he never received a private office, supervisor's cubicle or other private space within which he could comfortably rest without embarrassment or ridicule. While it is true that St. Paul indicated that it would try to get plaintiff a private office, the fact that it was not able to do so does not constitute a violation of the duty of accommodation. *See Schmidt v. Methodist Hosp. Of Ind.*, 89 F.3d 342, 344 (7th Cir. 1996) ("[r]easonable accommodation does not require an employer to provide literally everything the disabled employee requests"). The fact remains that the company did get plaintiff a separate cubicle with supervisory height walls and this space allowed plaintiff to put up his feet and rest, which were his stated medical needs. Plaintiff claims that he felt embarrassed about his need to

---

[11]This is not the only instance in which plaintiff has sought to complain after the fact about the failure to provide a particular accommodation that he clearly indicated at the time was not needed. In his January 7, 1997 email, plaintiff stated that he was not asking that he be allowed to work out of a "virtual office" from his home. *See* 1/7/97 email ("I was not requesting to become a virtual office situation, that was my doctor's suggestion in the letter he prepared."). However, in his amended complaint, he faults St. Paul for denying his request to "work out of a virtual office in his home." *See* ¶¶ 6, 8.

rest and therefore wanted more privacy. We do not think that this subjective concern is enough to constitute an ADA violation. "Not every personal discomfort nor workplace embarrassment rises to the level of a recognized disability requiring accommodation under the law." *Weiler v. Household Finance Corp.*, 101 F.3d 519, 526 (7th Cir. 1996).

Fifth, plaintiff complains that the company never provided him with an adequate emergency evacuation plan. However, St. Paul has pointed to evidence that it did respond to this concern, and plaintiff has not shown how this effort was lacking nor has plaintiff spelled out just what it is that the company should have done.

Finally, plaintiff complains that the reclining chair that was promised to him did not arrive until October of 1997. Although this aspect about plaintiff's claim is potentially more meritorious than the others, we find that it is also not actionable. Plaintiff has not shown that he raised any complaints about the delay in providing the chair. There is no evidence he ever called Gunderson or Heinrich or anyone else higher up in the company to complain about the failure to provide the chair. Moreover, he has not pointed to any evidence that he was having trouble at the time performing his job without the chair.[12] In his summary judgment brief, plaintiff admitted that he was able to perform the essential functions of his position throughout 1997 even without the recliner.

## II. The February 12, 1998 Meeting.

We now turn to the second half of plaintiff's case, which focuses on the February 12th meeting when plaintiff was told that he must work under the PIP and specifically must follow the

---

[12]Defendant points out that plaintiff only used the recliner twice after it was provided to him.

8-to-5 rule (*i.e.* that he not work from his home at any time during business hours).  In

comparison to the first half of his case, in which plaintiff seems to only protest mildly and

concedes that the company was acting in good faith, the second half of the case focuses on what

plaintiff believes was a deliberate and egregious attempt to discriminate against him.  Plaintiff is

upset by the decision by McCook, who was apparently acting in concert with Owens, to impose

the 8-to-5 rule.  According to plaintiff, this decision "dramatically changed" the interactive

process and brought it to a "screeching halt."

Plaintiff says that McCook simply walked into the meeting and told him that he must

follow the new rule without exception or he would be fired.  McCook allegedly told plaintiff that

the reason for the new rule was because of plaintiff's prior problems with Owens, thus allegedly

implying that the rule was an attempt to retaliate against plaintiff for his prior successful effort to

obtain accommodations in 1997.  Plaintiff says he tried to explain to McCook that he could not

comply with the new rule due to his disability but McCook showed no interest in accommodating

his disability.  Plaintiff believes that the new rule amounted to a revocation of the previously

agreed-to accommodation.  In this part of his claim, plaintiff is pursuing both a failure to

accommodate and a disparate treatment theory.

St. Paul disputes both the assertion that McCook had an improper motive in imposing the

8-to-5 rule and the assertion that the rule amounted to a revocation of the prior agreed-to

accommodations.  As to the motivation behind the rule, St. Paul insists that plaintiff had a history

of work performance problems that arose well before the company was even aware of plaintiff's

disability and that his performance worsened over the course of 1997.  The company thus

believes that it had a legitimate, job-related reason for imposing the PIP.  If we were only

considering the indirect, burden-shifting *McDonnell Douglas* framework, the company's argument might have more force.[13] However, unlike many cases, plaintiff has offered direct evidence of a discriminatory motive in the form of comments made by Owens and McCook, including comments that they did not want any "cripples" working in their department. Therefore, construing the record in plaintiff's favor, it is possible that, even though plaintiff did have performance problems, the two men still were trying to retaliate against him.[14]

St. Paul also disputes plaintiff's assertion that the 8-to-5 rule amounted to a revocation of previously agreed-to accommodation measures. It says that the 8-to-5 rule merely required that plaintiff not work out of his home at any time during business hours and that it did not preclude him from flexibly arranging his schedule and resting when necessary, which was the key point of the 1997 accommodations. Instead of resting at home, St. Paul argues that defendant could just as easily have rested while in his office or out in the field. After all, that was the purpose in getting the recliner and the cubicle. St. Paul further points out that plaintiff's doctor never stated that his medical condition required that he work at home – just that plaintiff found it more comfortable to do so.

Again, we find that plaintiff has come forward with enough evidence to create a disputed issue of fact on this particular issue. Viewing the record favorably to plaintiff, a jury could find

---

[13]A plaintiff proceeding under a disparate treatment theory may either present direct evidence of discrimination or may rely on the indirect *McDonnell Douglas* burden-shifting method. *Hoffman*, 256 F.3d at 572.

[14]Moreover, plaintiff's failure to accommodate theory does not really require him to show that the company's motives were bad. *See Hoffman*, 256 F.3d at 572 (in a failure to accommodate claim, "the *McDonnell Douglas* burden-shifting approach is not necessary or appropriate" because the plaintiff need only show that "the employer was aware of her disability and still failed to reasonably accommodate it").

that the 8-to-5 rule took away some part of the flexibility that was previously given to plaintiff in 1997 and therefore was unreasonable under the ADA. To cite a concrete example, one issue that arose previously was the difficulty plaintiff had with being in the car during the long rush-hour commute. To address this problem, the company specifically stated in its proposed accommodations that plaintiff would have the option of deciding to commute to work after rush hour:

> We are aware that rush hour in Chicago can make for a long ride. There are several options available. Many people choose to drive to work early. Others come in late and work late. Many ride the train. You may choose any of these options.

(12/16/96 Owens Email.) By imposing an absolute rule that plaintiff must always be either at work or at a job site by 8 o'clock in the morning, the PIP appears to have taken away this option.

Even if we accept all of the above allegations and assume that Owens and McCook were deliberately trying to discriminate against plaintiff and that the new rule made it impossible for him to work, we still would find that plaintiff's claim does not survive summary judgment for the basic reason that he prematurely quit his job without providing the company a chance to correct the problem. Our conclusion is based on the same basic reasons set forth above in Part I.

Plaintiff argues that McCook's harsh attitude and comments during the February 12th meeting made it absolutely clear to him that the company was not interested in continuing to accommodate his disability. He therefore made no attempt to talk to anyone else in the company about the problem.

In support of his decision to remain silent and quit, plaintiff relies heavily on the Seventh Circuit's decision in *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir.

1996).  Although we think this case provides the correct analytical framework for analyzing this question, we do not believe that it supports plaintiff's position because it addressed a different factual scenario.

In *Bultemeyer*, the Seventh Circuit analyzed the question in terms of who was responsible for the breakdown in the interactive process.  The employee (Bultemeyer) was a janitor who had worked for many years for the Fort Wayne Community Schools ("FWCS").  He suffered from a number of mental illnesses, including bipolar disorder and paranoid schizophrenia.  After taking a series of disability leaves, Bultemeyer sought to return to work and was told that he should report to one particular school and that he would not receive any special accommodations at this school.  In the past, FWCS had provided him with certain accommodations in the other schools he had worked.  After viewing the new school, Bultemeyer apparently had some concern about whether he could work there but he failed to communicate this concern in a later meeting and never showed up for work.  The company immediately fired him.

The Seventh Circuit concluded that, although the employee may not have clearly made a request for accommodation, it was not certain that he should be given full responsibility for the breakdown in the interactive process.  Plaintiff here particularly relies on the portion of the opinion stating that Bultemeyer "may have thought it futile to ask [for accommodation], after [the company's employee relations director] told him that he would not receive any more special treatment." *Id.* at 1285.  Plaintiff claims his situation is similar in that he was told by McCook that he would not receive any further accommodations.

We do not agree.  In *Bultemeyer*, the Seventh Circuit emphasized that its conclusion was strongly influenced by the fact that the employee suffered from serious mental illnesses. *Id.* at

-24-

1284 ("an understanding of mental illness is central to understanding Bultemeyer's request for accommodation"). The court said that Bultemeyer's failure to communicate was "the product of mental illness." *Id.* at 1286. In addition, although Bultemeyer initially failed to raise his concerns in a meeting with his supervisor, he later provided the company with a letter from his psychiatrist that did include an explicit request for accommodation.

In contrast, plaintiff here was not hampered by serious mental illnesses or other defects in his abilities to communicate. He had demonstrated on several prior occasions that he was able to raise his concerns and did so in a clear and ultimately successful way. Moreover, unlike Bultemeyer, plaintiff never attempted to provide the company with a letter after the fact. Not only did plaintiff remain silent, he affirmatively volunteered an alternative explanation for his decision to quit working, which was that his medication was acting up.[15] In addition, when plaintiff left work on February 12th, he specifically indicated in an email that his decision had nothing to do with his meeting with McCook. *See* 2/12/97 McKechnie Email to Olson ("I am in the office this morning for a meeting with Dave. I am going home sick this afternoon, not Dave['s fault!").

Another way to view plaintiff's decision to quit is by viewing it similar to a constructive discharge claim. Although plaintiff alleges that his decision to quit was due to the failure to provide reasonable accommodations and he therefore does not formally raise a constructive discharge claim, his allegations are very similar to those made in such cases. He says that, although he was not technically fired, he had no alternative but to resign. As explained by a

_____

[15]It is worth noting that plaintiff's condition is a deteriorating condition that typically worsens over time.

-25-

prominent commentator, most courts have required that an employee in this type of situation

must first give his employer a chance to fix the problem before resigning:

> [Courts] are increasingly requiring the employee to escalate matters to an appropriate level of management before a constructive discharge claim will lie. The evident purpose: to allow the employer *as an entity* – as opposed to, for example, an individual (and perhaps aberrational) supervisor – to redress the problem.

Lindemann and Grossman, Employment Discrimination Law, 3rd Ed., Vol. 1, p. 841 (emphasis

in original).

For example, in *Williams v. City of Kansas City*, 223 F.3d 749 (8th Cir. 2000), the Eighth

Circuit relied on this general principle. Tracy Williams sued the City of Kansas City for creating

and maintaining a hostile work environment and for retaliation. *Id.* at 751. She alleged that,

several weeks after working under a new supervisor, the supervisor (William Horn) began to

routinely call her into his office and that he made inappropriate sexual comments and stared at

her body. About a month later, when Horn once again asked her to come to his office for one of

his meetings, she refused and told Horn to leave her alone. Horn was mad and slammed the

door. After refusing to talk to her for several weeks, Horn approached Williams and told her that

she did not have enough paid leave time to take a family vacation that she had been long

planning to take and that she also could not take unpaid leave, something that was normally

given to all employees who asked for it. Williams concluded that Horn was trying to retaliate

against her and she tendered her resignation "[a]lmost immediately" after she had talked to him.

*Id.* at 752.

Williams won jury verdicts on both of her claims. On appeal, the Eighth Circuit affirmed

the verdict on the hostile environment claim. However, the court held that Williams had

presented insufficient evidence to support her retaliation claim. Williams was alleging that she was constructively discharged because her work environment was so intolerable that the only plausible alternative was to resign. *Id.* at 753. The court first concluded that Horn's denial of vacation leave time did not constitute an adverse employment action. Pertinent to our case, the court also concluded that the constructive discharge claim was defective on the separate ground that Williams resigned prematurely:

> [E]ven if Horn's vacation comments did constitute an adverse employment action, Williams' constructive discharge claim would fail nevertheless, because her ensuing resignation was premature. An employee "has an obligation not to assume the worst and jump to conclusions too quickly." *Phillips*, 156 F.3d at 890 (internal quotations omitted). Following Horn's comments, Williams made no attempt to inform her supervisors that she felt Horn was acting inappropriately. Rather, she abruptly quit. It is difficult to find an employee's resignation objectively reasonable and subject an employer to liability for constructive discharge when the employee quits without giving her employer a chance to fix the problem. *See id.* Because Williams did not permit the City to address her concerns, we cannot say that Williams' only plausible alternative was to resign.

*Id.* at 754.

We think that this principle applies equally in this case. Like Williams, plaintiff here never attempted "inform [his] supervisors" that Owens and McKechnie were "acting inappropriately." *Id.* Instead, just as Williams did, plaintiff "abruptly quit" without giving the company "a chance to fix the problem." *See also Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737-38 (5th Cir. 1999) (employee's decision to quit prematurely and "remain entirely mute" about the alleged discrimination made it clear that she had "sole responsibility" for the breakdown of the interactive process: "[t]he process broke down because she stayed silent, and quit.").

Plaintiff says he was justified in not taking his concerns to upper management because

-27-

McCook told him in the February 12th meeting that the PIP had been put together "by everybody."[16] Even if McCook made such a statement, we think that plaintiff still should have made some effort to talk to someone else. As we discussed in Part I, plaintiff was a veteran employee who was not afraid to complain, as demonstrated on two earlier occasions. Plaintiff offers no rational explanation for why he chose to remain silent this time.

We are not suggesting that he must have made heroic efforts. There were many options that required only small effort and likely would have triggered a response. He could have called Heinrich, Zonakis, Gunderson, or someone else higher up in the company. He could have written them a letter. He could have asked his doctor to write a letter as Bultemeyer did. He could have simply been honest in his February 12th email and indicated that he was not coming into work because he believed he was being discriminated against rather than stating that he was having problems with his medication. Instead, plaintiff chose to keep silent and apply for long-term disability benefits. This decision forecloses his claim under the ADA.

---

[16]The available evidence suggests that this statement (if made) was not true. Neither Owens nor McCook discussed with Gunderson the concept of restricting plaintiff's work from his home beyond that of other special investigators. McCook never spoke to Heinrich either. According to Owens' deposition testimony, no one authorized McCook to modify plaintiff's accommodations as a form of discipline or as part of a performance improvement plan.

## CONCLUSION

For the reasons stated above, the motion for summary judgment is granted and judgment is entered in favor of the defendant.


**ENTER:**

JOHN A. NORDBERG
**Senior United States District Court Judge**

**DATED:** 9/26/01